**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| **ADAM ROVINELLI,  JENNIFER CARLOS, and JUAN VASQUEZ, Individually and on Behalf of All Other Persons Similarly Situated,**  **Plaintiffs,**  v.  **TRANS WORLD ENTERTAINMENT CORPORATION and SYNAPSE GROUP, INC.**  **Defendants.** | Case No. _____  **CLASS ACTION COMPLAINT**  **Jury Trial Demanded** |

## COMPLAINT

Plaintiffs, Adam Rovinelli ("Rovinelli"), Jennifer Carlos ("Carlos"), and Juan Vasquez ("Vasquez") (collectively "Plaintiffs"), by their attorneys, allege the following on behalf of themselves and all others similarly situated (the "Subclasses" (defined below)), on information and belief based, *inter alia*, upon the investigation of their counsel, except as to those allegations which pertain to the named Plaintiffs and their attorneys, which are alleged on personal knowledge.  Named as Defendants are Trans World Entertainment Corporation ("Trans World") and Synapse Group, Inc. ("Synapse," and together with Trans World, "Defendants").

## NATURE OF THE ACTION

Defendants used highly aggressive sales tactics to charge thousands of consumers for, and profit millions of dollars from, bogus "loyalty memberships" and magazine subscriptions, which consumers did not consent to purchase. This class action complaint seeks to remedy Defendants' design and use of deceptive and misleading "Negative Option Marketing" such as "Free-To-Pay" conversions which lure consumers, such as Plaintiffs and the Subclasses'

members, with free offers, causing consumers to unknowingly and automatically become enrolled in unauthorized monthly charges for worthless subscriptions and memberships, whereby Trans World and its third-party marketing partners, including Synapse, charged consumers' credit cards, debit cards and/or bank accounts without consumers' authorization, knowledge or consent.

Defendants' lucrative scheme and predatory business model utilizes a host of highly misleading, confusing, unlawful, deceptive, and unfair acts and practices that deceive consumers. These acts and practices include, but are not limited to, the following: (1) enrolling and billing consumers for memberships and subscriptions without their authorization, knowledge or consent; (2) failing to provide consumers, such as Plaintiffs and the Subclasses' members, with all the material terms of the "Free-To-Pay" conversion prior to obtaining consumers' signatures; (3) failing to disclose to consumers, such as Plaintiffs and the Subclasses' members, all material terms of the "Free-To-Pay" conversion in a clear and conspicuous manner; (4) failing to clearly and conspicuously disclose to consumers, such as Plaintiffs and the Subclasses' members, all material terms of the transactions before obtaining consumers' billing information; (5) failing to obtain the consent of consumers, such as Plaintiffs and the Subclasses' members, before charging consumers' credit cards, debit cards and/or bank accounts; (6) failing to obtain the consent and authorization of consumers, such as Plaintiffs and the Subclasses' members, before transmitting and sharing consumers' personal and confidential billing information with Defendants' marketing partners; (7) failing to clearly and conspicuously disclose to a consumer, prior to the consummation of a transaction, the exact nature and extent of Defendants' auto-renewal, refund, return, or cancellation policies; (8) misrepresenting the nature and terms of Defendants' auto-renewal, refund, return, or cancellation policy; (9) failing to provide a simple

mechanism for consumers, such as Plaintiffs and the Subclasses' members, to stop recurring charges from being placed on the their credit cards, debit cards and/or bank accounts; (10) failing to clearly and conspicuously disclose to consumers, such as Plaintiffs and the Subclasses' members, that Defendants are passing consumers' personal, financial and billing information to Defendants' third-party marketing partners; and (11) failing to obtain the consent of consumers, such as Plaintiffs and the Subclasses' members, before Defendants' charge consumers' credit cards, debit cards and/or bank accounts.

## PARTIES

1.      Adam Rovinelli is, and at all relevant times was, a resident of 25 7 Springs Lane, Apartment 306, Burlington, Massachusetts 01803.

2.      Jennifer Carlos is, and at all relevant times was, a resident of 79 Maplehurst Avenue, East Longmeadow, Massachusetts 01028.

3.      Juan Vasquez is, and at all relevant times was, a resident of 123 Church Street, Enfield, Connecticut 06082.

4.      Trans World is a New York corporation and has a principal place of business at 38 Corporate Circle, Albany, New York 12203

5.      Trans World's primary business segment is "For Your Entertainment" ("FYE"), one of the largest specialty retailers of entertainment, video and music related products, operating approximately 270 stores in the United States, including 6 in Massachusetts, and the website www.fye.com.

6.      Synapse is a subsidiary of Meredith Corporation, an Iowa corporation, and has a principal place of business at 225 High Ridge Road, Stamford, Connecticut 06905.

7.    Synapse is the largest magazine marketer in the United States, targeting customers in non-traditional marketing channels such as retail stores, including FYE, airline frequent flyer programs, catalog companies, and credit card issuers.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(a).  Plaintiffs further allege upon information and belief that the number of members of the Subclasses is at least 100 and that the aggregate amount in controversy for Plaintiffs and the Subclasses' members exceeds $5 million.

9.    This Court also has jurisdiction under 28 U.S.C. § 1331, because this action is brought pursuant to the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq*.

10.    Venue and personal jurisdiction in this District are proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff Rovinelli resides within this District and Defendants do or transact business within this District.

## DEFENDANTS' DISCLOSURE REQUIREMENTS

### FREE-TO-PAY CONVERSIONS

11.    Under the Federal Trade Commission's ("FTC") "Guide Concerning the Use of the Word 'Free' and Similar Representations," when a business makes a "Free" or similar offer, "all of the terms and conditions upon which one can receive and retain the 'Free' item should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood."  16 C.F.R. Part 251.

12.    The Attorney General of Massachusetts, along with numerous other states' Attorney Generals, stressed to the FTC the following: "Free to pay conversion marketing uses a form of trickery, and sleight of hand as it were, to reap millions from consumers in a manner flatly

contrary to the ordinary rules of consumer transactions.  There is an inherent deception built into these plans by the marketers …" *See* Vermont, *et.al.'s* comments to FTC's "Prenotification Negative Option Rule" (Oct. 13, 2009) at p. 3 (hereinafter "AGs' Comment Letter").  A copy of the AGs' Comment Letter is annexed hereto as Exhibit A.  The AGs' Comment Letter highlights the "significant problems inherent in negative option trial conversions …"  The problems include, but are not limited to, the following:

   a.  The misleading character of negative options advertised as involving "free" or "trial" offers.  The long-term impression created by this type of terminology is that consumers have *no obligation* to do anything, not that their silence after acceptance of the offer will open them to recurrent charges of unlimited duration;

   b.  Consumers' lack of awareness as to the existence of ongoing periodic charges to their credit cards, debit cards and/or bank accounts, in connection with trial conversions; and

   c.  The piling up of trial conversion charges over long periods of time, amounting to substantial amounts of money, even where consumers make little or no use of the goods or services offered.

*Id.* at p. 4 (emphasis in original).

13.     Guidance from the Massachusetts Attorney General and other Attorneys General indicate that in a "Free-To-Pay" conversion, informed consent cannot be given at the outset of a trial period "because the trial period is most often touted without obligation or risk free and because it can and does lull customers into a state of forgetfulness; only at the end of the trial does the relationship between consumer and business transform into one in which the consumer is actually being charged."  *Id.* at p. 7

14.     The AGs' Comment Letter further states that "[t]he complaints we receive underscore the inherently deceptive nature of trial conversions, render retailers' disclosures meaningless and confuse and dupe even the most sophisticated consumer." *Id.* at p. 5

15.     Guidance from the FTC indicates that the "material terms" in "Free-To-Pay" conversions include, but are not limited to, the following:

> a.  the fact that the consumer will be charged a specified amount each payment period (*e.g.*, each month) until he or she cancels;
>
> b.  the fact that the amount of the charge may change, if true, and the amount to which it will change, if known;
>
> c.  the date on or about which the consumer will be charged each payment period;
>
> d.  how the consumer may cancel, including necessary contact information, such as an e-mail address or phone number;
>
> e.  the fact that there is a no-refund policy, if true;
>
> f.  the minimum purchase obligation, if any;
>
> g.  the length of the free trial period; and
>
> h.  the date by, or the time period within, which a cancellation request must be received to avoid being charged at all.

*See* https://www.ftc.gov/system/files/documents/federal_register_notices/2014/07/140725negativeoptionfrn1.pdf (last visited November 7, 2018).

16.     Senator Charles D. Rockefeller IV, Chairman of the U.S. Senate Committee on Commerce, Science, and Transportation (the "Senate Committee"), launched an investigation into e-commerce marketing practices in May, 2009 after thousands of online consumers complained to state Attorneys General, the Better Business Bureau, and other consumer advocates, of misleading and deceptive enrollment in various membership plans.   These consumers complained that they did not consent to enrolling in membership plans and only

learned that they were enrolled in membership plans after eventually seeing unauthorized charges on their credit card or checking account statements. *See* https://www.gpo.gov/fdsys/pkg/CHRG-111shrg54917/pdf/CHRG-111shrg54917.pdf (last visited November 5, 2018).

17.     The Senate Committee found abundant evidence that these aggressive sales tactics use a "free trial" period to automatically enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships.  These marketing schemes took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership at the end of the "free trial" period. *Id.*

18.     As a result of the investigation and findings, it was determined that "Free-To-Pay" conversions require a heightened level of disclosure to avoid misleading the reasonable consumer. *Id.*

19.     A violation of  the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of  M.G.L. c. 93A, s. 2 is considered a  *per se*  violation of M.G.L. c.93A, s. 2.

20.     Under Massachusetts law, it is unlawful and an unfair and  deceptive trade practice for a seller: "(a) To fail to <u>clearly and conspicuously</u>[1] disclose to a buyer, <u>prior to the consummation of a transaction</u>, the exact nature and extent of the seller's refund, return, or cancellation policy (emphasis added); (b) To misrepresent the nature and terms of the seller's

---

[1]     **"Clear and Conspicuous Disclosure.** Without limiting any other provisions of law, disclosures required by these regulations shall be of such size or color contrast and so placed as to be readily noticeable to purchasers or prospective purchasers reading advertising, sales promotional literature, or invoices containing same, or reading any representation as to content on the container in which the product is packed, or inspecting a product before installation or with a minimum of disassembly after installation. A term is conspicuous when it is so written that a person against whom it is to operate ought to have noticed it. Language in the body of a form is 'conspicuous' if it is in larger or contrasting type or color."

refund, return, or cancellation policy; and (c) To fail to perform any promises made to a buyer in connection with the refund, return, or cancellation privileges."   940 CMR 3:13(4) (a)-(c) (emphasis added).[2]

21.     It is a violation of the EFTA and Regulation E when the seller debits credit cards, debit cards and/or bank accounts on a recurring basis but (1) fails to obtain consumers' authorization for pre-authorized electronic transfers or (2) fails to provide consumers a copy of a written authorization signed, or similarly authenticated, for preauthorized electronic fund transfers.

22.     Under the Connecticut Unfair Trade Practices Act ("CUTPA") it is an unfair or deceptive practice to: "Advertise any merchandise or service as free by the use of the word 'free' or any other terms of similar import when the merchandise or service is not, in fact, free (see subsection (d) of this section). Failure to disclose any and all terms, conditions and obligations required of the consumer shall be a violation of sections 42-110b-1 to 42-110b-31, inclusive, of the Regulations of Connecticut State Agencies."   Conn. Gen. Stat. § 42-110b.

## PLAINTIFFS' SPECIFIC STATEMENTS OF FACTS

I.     ROVINELLI

23.     In or around November 2017, Rovinelli made a purchase at an FYE store in Salem, New Hampshire, using his personal credit card ("Rovinelli's credit card").  At the time of his purchase, an FYE sales representative verbally solicited Rovinelli for a "free" "VIP membership rewards card" ("VIP Backstage Pass") along with a "free" magazine offer (collectively referred to herein as "free offers" or "free trials").

---

[2]      940 CMR 3.00 (General Regulations) and 940 CMR 6.00 ("Retail Advertising") are promulgated pursuant to M.G.L. c. 93A, s. 2(c) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, s. 2(a).

24.     Prior to obtaining Rovinelli's consent to the free trials, Defendants failed to clearly and conspicuously disclose the material terms, including but not limited to: the amounts that would be charged to Rovinelli's credit card, the dates of those future charges, the membership and subscription auto-renewal features, the cancellation policies, the refund policies, and that the magazine subscription was with, and would be charged by, Trans World's marketing partner, Synapse.

25.     Rovinelli accepted the "free" offers but was not informed that the offers were actually free-to-pay conversions for which his credit card would be automatically billed and the paid subscriptions/membership would auto-renew until he affirmatively and separately cancelled each subscription/membership.  Trans World's VIP Backstage Pass membership and Synapse's magazine subscriptions were unwanted, worthless and not authorized by Rovinelli or the Subclasses' members.

26.     If Defendants had adequately disclosed the material terms of the magazine subscriptions and VIP Backstage Pass membership, Rovinelli would not have accepted the "free" offers.

27.     On or about February 25, 2018, Rovinelli's credit card was charged a total of $42.00 for an "online, mail or telephone transaction" for magazines by Synapse without Rovinelli's authorization, knowledge or consent.

28.     Likewise, on or about March 1, 2018, Rovinelli's credit card was charged $11.99 for an "in-person transaction" for "FYE Backstage Pass" by Trans World without Rovinelli's authorization, knowledge or consent.

29.     Sometime between November 2017 and February 25, 2017, Trans World transmitted Rovinelli's personal and confidential financial information to its marketing partner, Synapse, without Rovinelli's knowledge, authorization or consent.

30.     Trans World derived a financial gain from its marketing partner, Synapse, charging Rovinelli for unwanted magazine subscriptions, but Rovinelli derived no benefit from the subscriptions.

31.     In or around March 2018, Rovinelli contacted FYE to complain about the unauthorized membership and magazine charges.  Trans World later refunded Rovinelli $11.99 for one month of VIP Backstage Pass membership fees, but Defendants failed to refund Rovinelli interest or issue any refund for any of the unauthorized magazine charges.

II.     <u>CARLOS</u>

32.     On or about November 10, 2017, Carlos made a purchase at an FYE store in Holyoke, Massachusetts using her personal debit card ("Carlos' debit card").  At the time of her purchase, an FYE sales representative verbally solicited Carlos for the "free" offers.

33.     Prior to obtaining Carlos' consent to the free trials, Defendants failed to clearly and conspicuously disclose the material terms, including but not limited to: the amounts that would be charged to Carlos' debit card, the dates of those future charges, the membership and subscription auto-renewal features, the cancellation policies, the refund policies, and that the magazine subscriptions included in the free trials would be charged by Synapse.

34.     Carlos accepted the "free" offers but was not informed that the offers were actually free-to-pay conversions for which her debit card would be automatically billed and that the paid subscriptions and membership would automatically renew until she affirmatively, and separately, cancelled both the subscriptions and the VIP Backstage Pass membership.

35.     The magazine subscriptions were unwanted, worthless and not authorized by Carlos or the Subclasses' members.  On or about January 16, 2018, Synapse, without Carlos' authorization, knowledge or consent, charged Carlos' debit card $14.00 for magazine subscriptions.  If Defendants had adequately disclosed the material terms of the magazine subscriptions and membership, Carlos would not have accepted the "free" offers.

36.     Trans World derived a financial gain from its marketing partner, Synapse, charging Carlos for unwanted magazine subscriptions, but Carlos derived no benefit from the subscriptions.  Trans World transmitted Carlos' personal and confidential financial information to its marketing partner, Synapse, without Carlos' knowledge, authorization or consent.

37.     In or around January 2018, Carlos cancelled the magazine subscriptions.  Despite Carlos' cancellation, and that fact that she was billed without her knowledge, authorization or consent, Defendants failed to issue any refund to Carlos for the unauthorized magazine charges.

III.     <u>VASQUEZ</u>

38.     In or around September 2016, Vasquez made a purchase at an FYE store in Massachusetts using his personal debit card ("Vasquez's debit card").  Without his authorization, knowledge or consent, Trans World enrolled him in its VIP Backstage Pass membership and began charging Vasquez's debit card $11.99 per month around October 2016.

39.     Trans World's VIP Backstage Pass membership is worthless, useless, and unwanted by Vasquez and the Subclasses' members.

40.     In or around mid-2017, Vasquez noticed unauthorized $11.99 per month charges for "FYE Backstage Pass" (*i.e.* VIP Backstage Pass) membership to his debit card.  In total, Trans World charged Vasquez a total of approximately $167.00 for the membership without

Vasquez's knowledge, authorization or consent.  Vasquez paid approximately $167.00 but derived no benefit from Trans World's VIP Backstage Pass membership.

41.    In or around November 2017, Vasquez called FYE and complained about the unauthorized membership charges and demanded proof that he affirmatively enrolled. Membership Support sent him a letter dated December 7, 2017, wrongly alleging that he had given "a positive response to (their) direct mailing offer" and cancelled his membership.  A copy of the letter is annexed hereto as Exhibit B.

42.    To date, Vasquez has not received a refund for any of Trans World's unauthorized membership charges.

## DEFENDANTS' LUCRATIVE "LOYALTY PROGRAM" SCAM TO INCREASE PROFITS

43.    Due to the long-term decline of its brick-and-mortar retail business, in or around 2005, Trans World began exploiting its customer base to increase profits.  According to Trans World's 2005 Annual Report, Trans World "launched Backstage Pass, a customer loyalty program aimed at building greater share-of-wallet per customer" boasting "(o)ur unique, customer-driven shopping experience gives us another advantage – and opportunity" and "we have access to over 1 million members."  *See* Trans World's 2005 Annual Report, available at http://media.corporate-ir.net/media_files/irol/78/78154/reports/TWEC_2005_AR.pdf (last visited on October 31, 2018).

44.    In 2006, Trans World showed further concern over the declining trend in retail sales and the company's need to generate new revenue; then-CEO R.J. Higgins ("Higgins"), in the 2006 Annual Report, stressed that "[t]he key once again is minimizing the impact of the industry-wide decline in music sales [by]…maximizing the growth in our other product lines…,"

promising shareholders that the company would "broaden the reach of Backstage Pass, our customer loyalty program, by increasing membership and targeting these core customers – via email and at the point of sale…." In fact, targeting customers "at the point of sale" for the "Backstage Pass" loyalty program was a "Key 07' initiative" for Trans World.[3]

45.    By 2007, Defendant Trans World's Backstage Pass loyalty program was a measured success and the company was charging annual membership fees for its Backstage Pass loyalty program, and, according to Higgins, these "Backstage Pass customers…continue to account for an ever increasing share of our total sales" and the company was "poised for a return to profitability."  *See* Trans World's 2007 Annual Report available at http://library.corporate-ir.net/library/78/781/78154/items/297649/TWEC_2007_Annual_Full.pdf (last visited on October 31, 2018).

46.    From approximately 2007 through some time in 2012, Trans World charged about $25/year for its loyalty card. *See* Trans World Annual Reports available at http://phx.corporate-ir.net/phoenix.zhtml?c=78154&p=irol-reportsannual (last visited on October 31, 2018).  At some point in 2012, Trans World began charging its customers $11.99/month for its loyalty card. From 2012 through 2016, according to its 2016 Annual Report, Trans World earned over $23 million in revenue from "third party commission and management fees" from the FYE segment, including kickbacks from magazine subscriptions, which Trans World deceptively solicited to its customers as being "free" in conjunction with its deceptive "free" VIP Backstage Pass membership offers.  Trans World's 2016 Annual Report available at http://media.corporate-ir.net/media_files/IROL/78/78154/88367_web05232017161551.pdf (last visited on October 31, 2018).

---

[3]    Trans    World's    2006    Annual    Report    available    at    http://media.corporate-ir.net/media_files/irol/78/78154/reports/TWEC_2006_AR.pdf (last visted on October 31, 2018).

47.     Trans World continued to reap increasing profits from its aggressive membership and subscription scam throughout its FYE segment in order to offset its retail demise.  Although Trans World's retail operations continued to decline – during fiscal 2016 and 2017 Trans World closed 54 retail stores and anticipated closing more stores – its 2017 Annual Report showed $5.6 million in revenue "comprised of third-party commission income and management fees related to the FYE segment."     Trans     World     2017     Annual     Report     available     at http://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_TWMC_2017.pdf (last visited on October 31, 2018).  This represented an increase of nearly $1 million over the previous year – amounting to a staggering $29 million in third-party marketing revenue in just 6 years.     *See*     Trans     World     Annual     Reports     available     at     http://phx.corporate-ir.net/phoenix.zhtml?c=78154&p=irol-reportsannual (last visited on October 31, 2018). This increase is consistent with Trans World's marketing partner, Synapse's, business plan of "helping its marketing partners increase profits through magazine subscriptions…"[4]

48.     Defendant Trans World's "Backstage Pass" loyalty card scam, the gateway to its multi-million dollar third-party commission profit scheme, was and continues to be extremely lucrative, generating $50 million in loyalty card fees over the last three years alone.  Trans World's 2017 Annual Report reflects $17.9 million, $16.3 million, and $15.6 million in loyalty card fee revenue in fiscal 2017, 2016 and 2015 respectively, with net revenue (after refunds), of $7 million, $6.5 million and $6.3 million, respectively.  *See* Trans World 2017 Annual Report, *supra*.

**EMPLOYEES REVEAL DETAILS OF DEFENDANTS' SCAM**

---

[4] *See* https://synapseretailventures.wordpress.com/ (last visited on October 31, 2018).

49.    Defendants' employees have filed many online reviews detailing Defendants' unfair and deceptive marketing scam, which came from the highest levels, in which employees were ordered to sell customers "drivers" or "attachments" (memberships and subscriptions) designed to richly profit Defendants  under the guise of the offers being "free." Some examples are listed below:

> There is an insane amount of pressure to sell the loyalty card, magazine subscriptions, and to get people's e-mails…The charge is automatically billed to the credit card used to sign up after 30 days if the customer doesn't call to cancel. This 30-day free trial is what  you push. The goal is 1 out of every 10 credit card sign-ups, but it's more like 1 out of every 5 for the ever-climbing "company average." …The company sends about 10 e-mails a day to your store, begging/threatening the managers to get their numbers up. You will be fired if you go two days in a row without signing someone up... people do not want magazine subscriptions. It is 2017… I know CDs and DVDs don't sell like they used to, but there has to be a better way than scamming people…Your desperation shows in the 10 threatening e-mails you send to the managers every day.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P4.htm (last visited on September 20, 2018).

> the focus on getting company 'drivers' is too intense. Rather than driving the sales of tangible physical products that customers come to the store as a destination for, the company pushes the focus on intangible, company subscription products (i.e. paid membership). Sales can be excellent for the day in terms of dollar amount but it means  nothing to the corporate superiors if the driver percentage is low. Driving these intangible products, as heard by regular customers, hurts the business. The focus needs to be on the actual product of the store, the media and the merchandise but it just isn't. Instead the push is on subscription.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P8.htm (last visited on September 20, 2018).

Upper management literally expects you to deceive people into getting a discount card and magazines that begins as a free trial but will end up charging them. If you do not meet company's set expectations, you're often belittled and put on a daily conference call or expected to send multiple emails to your district and regional managers each day to report how many sign ups you have so far.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P4.htm (last visited on September 20, 2018).

Company hard focused on deceptive sales. This is clearly where DvD, CD, and magazines salesmen came to die. Employees are held over the coals to sell memberships. Employees jobs are held hostage. If you dont make membership and magazine sales goals you face demotion and termination.  **Advice to Management** Dont be dishonest when hiring and tell prospective employees that they arent a part of a money scam.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P3.htm (last visited on September 20, 2018) (emphasis in original).

Corporate focus is off of the bread and butter of the company. Having to sell magazine subscriptions and discount cards which are both automatic debit scams.

 https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P4.htm (last visited on September 20, 2018).

the drivers are so stressful it makes you feel like less of a person. the company wants you to manipulate customers into signing up for things that will charge their credit card, you get screamed at for not scamming enough people and no matter how many you get to sign up it is never good enough.

https://www.glassdoor.com/Reviews/Employee-Review-f-y-e-RVW2392658.htm (last visited on September 20, 2018).

**unethical.  scams  customers  who  don't  know  any better**…heavily pressured to scam customers into signing up for

16

magazine and rewards card subscriptions that are 1. free at first then charge your card later 2. are very difficult to cancel.

https://www.glassdoor.com/Reviews/Employee-Review-f-y-e-RVW13575923.htm (last visited on September 20, 2018) (emphasis in original).

> The worst part of the job is what they called 'drivers' the discount card that if not canceled charges the customer $12 a month, and the magazines that could charge over $125 if not cancelled. Every credit card transaction we were supposed to pitch both. The pitch that they wanted you to pitch is very mis leading.  Act like both are totally free until the transaction is over. Then explain that they would have to cancel. I had so many customers get very understandably angry because they felt misleaded. Pay is also way under industry standards. If you enjoy high stress and want to lie to people this is the job for you.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923.htm (last visited on September 20, 2018).

> discount card & magazine pitch was a scam and if you didnt meet the 'expectations', you face termination.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P2.htm  (last visited on September 20, 2018).

> I have to promote and sell the cards that are supposed to save people money, yet it charges them. And the dreaded magazines... I have worked at the store for over a year and a half, and I'm happy to finally be quitting.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P4.htm  (last visited on September 20, 2018).

> Having to hard sell loyalty cards, magazine subscriptions, and warranties to every single customer. When you don't make your personal and store goals on these items you get written up and threatened with termination…Let employees just sell the product instead of spending all their time pitching 'drivers' which are really rip offs for the customers. Once someone gets burned, they won't come back, and that's why f.y.e. is struggling right now.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P4.htm (last visited on September 20, 2018).

> unrealistic sales goals, shady sales practices. Pay is horrible. Management encourages you to lie to customers in order to close sales on discount cards and magazine subscriptions.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P6.htm (last visited on September 20, 2018).

> required to 'sell' a certain amount of store cards - store cards which basically cheat you out of money! written up if don't meet a sales quota…**Advice to Management** don't require your employees to screw your customers.

https://www.glassdoor.com/Reviews/f-y-e-Reviews-E240923_P6.htm (last visited on September 20, 2018) (emphasis in original).

> As a former employee of F. Y. E. (For Your Entertainment), a Entertainment store that sells DVD's, CD's, and other sorts of entertainment to customers is a part of the Company Trans World Entertainment. I am coming on this report that I have certified knowledge that a District Manager for this company has abused his power and has no remorse for firing employees for not lying to customers.. This scum has blatantly went to stores, has told managers that they must tell customers lies and deceptions in order to sell products so he can receive a bonus for his so called 'Hard Work'. For example, the Back Stage Passes and the Magazines. This guy wants all employees to combine the two offers into one, when they are not one offer. If you buy a back stage pass, he wants associates to tell customers because they bought a backstage pass, they get two free months of magazines for free. But the associate has to take your information twice for both offers. And even if you do decide to take this deal. There have been a number of complaints about customers calling and stopping the magazines from coming but are still being charged for the service. And when they try to get ahold of the company, they are either put on extensive holds excessing more than 15 minutes or they are hung up on…. as a former employee, I deem it necessary to to give the people a little behind the scenes look on how this company and District Manager do business, so they can receive some sort of profit and/or Bonus… This District Managers name is Sean Crowell.

https://usacomplaints.com/shops-trade/527088-fye-trans-world-entertainment-complaints-reviews.html (last visited on September 20, 2018).

> I have been working at Synapse Group full-time…Morale is low over the past year... It seems as if everyone is about to jump ship. Many people do not think Time Inc or Synapse will be able to find a way to stop the diminishing revenue from poor magazine sales…

https://www.glassdoor.com/Reviews/Employee-Review-Synapse-Group-RVW6619295.htm (last visited on September 20, 2018).[5]

## CONSUMER COMPLAINTS

50.     Despite having received hundreds if not thousands of complaints from consumers over the past decade, Defendants have continued their highly lucrative unfair and deceptive membership and subscription scams. The Internet contains hundreds of consistent consumer complaints about Defendants' subscription and membership scam.  For example:

> I was very displeased with my encounter with f.y.e. when signing up for the membership. I was told it was free then I started to notice I was getting billed and they told me it was taken out monthly. I called to ask about this and was told when I wanted to cancel I would get a refund which I didn't get because they 'can't do that'.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

> I got the backstage pass because my cashier insisted I get it but never told me it charges every so often… I called to cancel it…because I saw that it started charging me. They WOULD NOT let me cancel my account… She then basically told me that they aren't letting people canceling their membership because they are 'on a tight budget'…. So def do not get the membership unless you want to be scammed.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

---

[5] Additional employee complaints are included in Appendix A annexed hereto.

I was totally scammed by f.y.e... At that time I never picked out or purchased any magazines... just the CD I bought…When I went online to check my credit card account the 3rd of July I find a charge for $83.50 for magazines. I immediately called my credit card company and disputed the charges... after realizing that I had not used my card for any purchases with automatic billing I traced it back to FYE. Upon calling them they put me through 3 different people who told me that it would be investigated and my money refunded. I still don't have my money back as of today...called FYE and was given another number to call for magazine information...Guess what. NO RECORD of them ever billing my credit card. At this point I am furious and will not rest till I get my money back.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

…They tell you that signing up for a backstage pass is free and doesn't cost money. Then they automatically sign you up for a magazine subscription that you have to cancel separately from the backstage pass (which they never mentioned). The employee in the store flat out lied to me about this and when I contacted customer service they said they had nothing to do with the magazines. They hustled me out of money with their little scam.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

I walked into my local FYE and was asked if I wanted to sign up for a free trial. I was told it would grant me 10% off on my purchases in the store in the future if I created an account, so I did. What they didn't tell me was that they charge you at random for the FYE VIP membership even if you never asked for it. I created my account with FYE over 2 months ago and I randomly got a $11.99 Fee for this 'membership' that I never signed up for…I'm confused why these FYE scammers are allowed to do business. Why are people allowed to backstab their customers by ** them into "hey if you create an account with us, you'll get 10% off all purchases in the future!" when the truth is, the moment you say "Okay!" they add you onto the trial membership and charge your card you use on a monthly basis without your consent, this is fraud and should be vetted out thoroughly and all money stolen from customers should be returned. For your own privacy and money, don't do business with these ** artists.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

This is the first bad review I have ever written in my life…Fye backstage pass took advantage of a girl like me. Checking out at fye I thought I was getting a rewards card. The clerk never told me it was a free trial and I would actually get charged!... Never told any info about how my card was being sent out to these two companies and the next few days I have these weird charges for these magazines and stuff!  Getting this was super easy getting rid of this and I the charges was really hard…. This is the most slimy deceiving thing! Young people mostly shop at fye and the goal for this is tricking people into thinking it's a rewards card rushing them to sign and then taking their money and then when you call they will do anything to keep the money and then confuse you. Fye I swear to goodness this is the most greedy thing ever, you never told me this was going to happen! I thought it was a rewards card! Fye shame on you! I am so young and poor and I can't afford to put up with this! Shame on you. Shame on whoever created this because they know it's a trick. They know this is what is going to happen to young kids. Shame.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

When I was checking out the clerk told me about the Backstage Pass membership and that it was free. Imagine my surprise when I check my bank account today and see they have charged me 11.99. Which means they kept my credit card info without informing me. As I signed no agreement for a month to month plan I will be disputing the charge. Shameful business practice.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

I wish I could give them 0 stars honestly…The cashier rushed through my purchase and asks "do you want to sign up for this discount card, it will save you 10%" and I thought sure, why not - this is an expensive item to begin with. She did NOT explain it was a "free 30 day trial" to their ridiculous membership. She did NOT mention I would later be charged 11.99$ if I didn't log on and cancel my "subscription" before the 30 days were up. … I just looked at my monthly bank statement today and saw that 11,99$ fee and was so confused by it. I literally had to Google what "FYE BACKSTAGE PASS" was because I was positive I didn't make that charge. When I got on the phone with the customer service rep he took at least 5 minutes rambling on about keeping the membership and reducing it to like 4.95$, saying I can use it towards 3D movies or restaurants or something. Couldn't understand the guy. When I told him I just wanted to CANCEL my

membership, he tried to tell me he was going to reduce it and is there anything else he could help me with. This company is such a scam and I will never be shopping there again.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

'VIP' membership - What an absolute scam, & mistake on my part. They bribe you in store with a 10% discount, asking you to sign without mentioning the fact that it's a $12 monthly subscription for garbage magazines nobody wants…Hey FYE, if you're so desperate for dollars that you have to trick paying customers into some lame magazine subscription, MAYBE just maybe it's time to call it quits. Nobody buys CDs anymore & nobody wants your garbage merchandise…

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

I went into the local F.Y.E. store at the mall because they had turntables on sale, went to the register to pay, and was offered to join the f.y.e. backstage pass club, which was described to me as "free". I was given no membership card, nor was I ever informed I would be charged $11.99 a month later. This is a blatant scam to try to get money from people. I will NEVER shop here again if they are willing to OPENLY LIE to their customers like this.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

I signed up for a free trial of FYE's backstage pass and the cashier told me I had to select some magazines to get a free issue of. There was a long line and my eyesight is bad so if there was any fine print I was not able to see it. Anyway, They apparently signed me up for a year subscription for time and people magazine for a total cost of $108.00. I called FYE's backstage pass service line and was told I had to call a third party. I was sent to an automated line that had no discernible option to get a refund on the amount that was already charged to me… FYE essentially scammed me out of what for me is a whole week of pay! The whole process of being assured a refund took me hours and many tears (because I am financially incapable of paying $108.00 on magazines and I was very frustrated too). I will never shop at FYE again and I will discourage my friends from shopping there too…

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

Along with other reviewers here, I too was fraudulently charged for magazine subscriptions I did NOT want! I tried numerous times to correct this and ordered new bank cards twice but they kept charging my account anyway. I ended up closing my account and switching to a new bank altogether over this mess! I will NEVER spend another dime in FYE and if any of you consumers do shop in there, please be safe and use cash... never use a card!

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

Made a purchase for my daughter at their store in Altamonte Mall. Asked if I wanted to join their rewards club, I was assured it did not cost anything, I didn't want to pay for anything additional. Lo and behold, my credit card starting getting charged a membership fee and magazine subscriptions, which were not authorized. If you ever buy anything at this store using a credit or debit card you need to pay close attention to fraudulent charges for many months or years, the last time we shopped at this store was 6 months ago.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

My daughter's credit card information was taken without her permission, she was offer the backstage pass, she specifically asked if there was any charge for it, they said 'NO'…, she made a purchase that same day on the store, and they took her credit card information from that purchase. It didn't happen just to my daughter. It has happen to some of her friends too, and the moms had to get involve to get their money back. They charged my daughter from December 2016 to July, twice in May…Shame on this company, this is stealing and lying, it's a big company shame on them. I will never buy from them again and so is my daughter and her friends. It's not the only company to buy stuff. Don't be fooled and don't trust this company.

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).

I bought a couple of items at this store. The cashier asked if I wanted to enroll in their loyalty program. I said sure thinking it was like my CVS or Kroger card. I was also told that I would receive a free issue of a couple of magazines. Well, this month I noticed a charge for their loyalty card. Looked at my account and it was charged last month as well. In addition, I was charged for the magazines this month. I called their customer service and asked for a refund since I was never

informed by the cashier or the paperwork for the card that I
would be charged….What a scam!

https://www.consumeraffairs.com/home_electronics/fye.html (last visited September 20, 2018).[6]

## PLAINTIFFS' ALLEGATIONS

51.     Trans World's in-store solicitation of "free" and "loyalty" memberships and magazine subscriptions and unauthorized enrollment of unsuspecting consumers into worthless memberships and subscriptions was unfair, deceptive and failed to provide Plaintiffs and the Subclasses with all material terms of the "Free-To-Pay" conversions.  The only "loyalty" aspect of the membership was Trans World's "loyalty" to maximize profits in a declining retail market.

52.     Defendants failed to disclose to Plaintiffs and the Subclasses all the material terms of the free-to-pay conversions in an effort to induce consumers to accept the "free trials."  Despite failing to disclose the material terms, Trans World and its marketing partner, Synapse, charged consumers' credit cards, debit cards and/or bank accounts for bogus memberships and unwanted magazines without consumers' express consent, and continued to do so until consumers affirmatively, and separately, cancelled each membership subscription.  These practices resulted in millions of dollars of profit for Defendants through their direct billing and lucrative revenue sharing agreement.

53.     Trans World disclosed and transmitted Plaintiffs Rovinelli's, Carlos' and the Subclasses' members' personal, confidential and financial information to its marketing partner, Synapse, without Plaintiffs' and the Subclasses' members' knowledge, authorization, or consent. Defendants knew or should have known that consumers billed for worthless and unwanted memberships and subscriptions was a likely result of the Defendants' failure to disclose all material terms of the free-to-pay conversions.

---

[6] Additional consumer complaints are included in Appendix B annexed hereto.

54.     Defendants failed to disclose to Plaintiffs and the Subclasses' members all material terms in a clear and conspicuous manner.  For example, even if material terms were disclosed, those terms were not properly disclosed, as explained below:

a. Defendants placed some material terms and conditions in places where a reasonable consumer would not actually perceive and understand the disclosures within the context of the acceptance of the "free trial" offers;

b. Defendants placed some material terms and conditions in locations where they were not likely to be read or seen;

c. Defendants placed some material terms in terms and conditions that they knew or should have known that consumers did not and could not typically read;

d. Defendants prominently featured and highlighted non-material terms and advertisements in large font size and color highlights to distract attention away from the material terms;

e. Defendants prominently featured and highlighted "free" and failed to properly disclose that consumers had to affirmatively cancel within a period of time or charges would automatically apply to consumers' credit or debit cards;

f. Defendants failed to clearly and conspicuously inform consumers about how to cancel by putting the cancellation information away from information relating to the "free" offer;

g. Defendants failed to provide Plaintiffs with an option to decline the ongoing monthly membership or monthly subscription, and/or prevent Defendants from charging them for subsequent memberships or subscriptions at the time of accepting the "free" offer;

h. Defendants failed to provide the amount of the charges and the date the charges would occur on Plaintiffs' or consumers' credit or debit cards or would be withdrawn from Plaintiff's or consumers' bank accounts; and

i. Defendants failed to clearly and conspicuously disclose their refund policies.

55. Defendants' failure to disclose the material terms, or intentional concealment of material terms, prevented consumers, including Plaintiffs and the Subclasses' members, from acquiring material information.

56. Defendants failed to clearly and conspicuously disclose to Plaintiffs and the Subclasses' members all material terms before obtaining their billing information.  For example, even if all of the material terms were disclosed and they were disclosed in a clear and conspicuous manner, Defendants disclosed those terms only after obtaining their billing information.

57. Defendants failed to obtain the express informed consent of Plaintiffs and the Subclasses' members before charging their credit cards, debit cards, and/or bank accounts.  For example:

   a. Defendants did not obtain the express consent of Plaintiffs and the Subclasses' members before charging consumers' credit cards, debit cards, and/or bank accounts and Defendants additionally failed to adequately notify the consumers or otherwise obtain any consent from the consumers at the end of the "free" trial;

   b. Defendants failed to send adequate notice to help prevent the continuation of unknowing or unwanted membership or subscription charges to consumers' credit cards, debit cards, and/or bank accounts even though Defendants had Plaintiffs' and the Subclasses' members' addresses, email addresses, and phone numbers;

   c. Defendants did not obtain the express informed consent of Plaintiffs and the Subclasses' members because the consumers did not agree to purchase the memberships or subscriptions for the prices charged and were not aware that the recurring charges would be billed to their credit cards, debit cards, and/or bank accounts;

   d. Defendants did not obtain the express informed consent of Plaintiffs and the Subclasses' members to charge consumers'

credit cards, debit cards, and/or bank accounts because silence or inaction was not express consent;

e. Defendants did not obtain the express consent of Plaintiffs and the Subclasses' members to charge consumers' credit cards, debit cards, and/or bank accounts because consumers did not receive all material terms before giving any asserted express consent;

f. Prior to the consummation of Defendants' free-to-pay conversions, Defendants failed to clearly and conspicuously disclose to Plaintiffs and the Subclasses' members the exact nature and extent of Defendants' billing, refund, return, or cancellation policies and automatically enrolled them into Defendants' membership subscriptions; and

g. Defendants failed to provide Plaintiffs and the Subclasses' members with a simple mechanism for them to stop recurring charges from being placed on their credit cards, debit cards, and/or bank accounts.

## CLASS ACTION ALLEGATIONS

58. Plaintiffs bring this action on behalf of themselves and all other similarly situated members of the Subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure. This class action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23 and the provisions therein.

59. The proposed Subclasses are as follows:

a. "Debit Card Class:" All persons residing in the United States who had their debit card charged, or bank account debited, by Trans World for a VIP Backstage Pass membership or by Synapse, for magazine subscriptions, without Defendants first obtaining proper written authorization signed, or similarly authenticated, for preauthorized electronic fund transfers within one year prior to filing this Complaint.

b. "Credit Card Class:" All persons residing in the United States who had their credit card charged by Trans World for a VIP Backstage Pass membership or by Synapse, for magazine subscriptions, without Defendants first obtaining

27

proper written authorization signed, or similarly authenticated, for preauthorized electronic fund transfers within one year prior to filing this Complaint.

c. "Membership Class:" All persons residing in the United States who were enrolled via in-store application and charged for VIP Backstage Pass memberships.

d. "Magazine Subscription Class:" All persons residing in the United States who were charged for magazine subscriptions by Synapse, Trans World, or FYE, or by any other company authorized to do so by either Defendants or FYE.

e. "Connecticut Class or CUTPA Class:" All persons residing in Connecticut who were enrolled via in-store application and charged for VIP Backstage Pass membership and/or were charged for magazine subscriptions by Synapse, Trans World, or FYE, or by any other company authorized to do so by either Defendants or FYE (together with the Debit Card Class, Credit Card Class, Membership Class and Magazine Subscription Class, collectively, the "Subclasses").

60. Plaintiffs reserve the right to modify the Subclasses' definitions before moving for class certification, including a reservation of the right to seek certification of additional subclasses, if discovery reveals that modifying the definitions and/or seeking additional subclasses would be appropriate.

61. The Class Period is limited to the applicable statute of limitations for claims at issue and runs until the date of entry of final judgment in this action.

62. The Subclasses are, collectively, composed of at least several thousand people, the joinder of whom is impracticable except by means of a class action. The disposition of their claims in a class action will benefit the parties and the Court. Defendants sell hundreds of memberships and subscriptions per month, or more, and the members of the Subclasses are so numerous and geographically dispersed across the United States that joinder of all Subclasses' members is impracticable, if not impossible.

63.     Defendants have acted with respect of the Subclasses in a manner applicable to each Subclass member.  There is a well-defined community of interest in the questions of law and fact involving and affecting the parties to be represented.  Common questions of law and fact exist and such common questions predominate over any questions of law or fact which may affect only individual members of the Subclasses.  Such common questions include but are not limited to the following:

a.  Whether Defendants omitted, concealed or misrepresented facts concerning enrollment in the membership and subscription programs and whether such omissions, concealments, or misrepresentations were intended to and did mislead and deceive consumers;

b.  Whether Plaintiffs and the Subclasses' members' credit card, debit card and/or bank account information was wrongfully accessed or caused to be accessed by a party who was not authorized to access Plaintiffs' and the Subclasses' members' private credit card, debit card and/or bank account information;

c.  Whether the members of the Subclasses did not execute written agreements properly detailing the terms, amounts, and dates of the automatic or recurring electronic payments;

d.  Whether the members of the Subclasses did not provide either a written ("wet") or electronic signature authorizing the automatic or recurring electronic payments and Defendants did not provide the Subclasses' members with such authorization;

e.  Whether Defendants took unauthorized payments from the Subclasses' members' accounts even though Defendants did not have the required written or electronic authorization for such payments;

f.  Whether Defendants obtained the bank account, credit card or debit card information of Plaintiffs and the Subclasses' members through fraud, misrepresentation or deceptive practices;

g.  Whether Defendants committed unfair and deceptive acts and practices in surreptitiously charging Plaintiffs and the

       Subclasses for enrollment in VIP Backstage Pass and magazine subscriptions;

h.   Whether Plaintiffs and the Subclasses have sustained damages and loss as a result of Defendants' actions, and the nature and extent of damages to which Plaintiffs and the members of the Subclasses are entitled;

i.   Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Subclasses;

j.   Whether the acts and omissions of Defendants violated Connecticut General Statutes §§ 42-110a, *et seq.*; and

k.   Whether Defendants' omissions, concealments or misrepresentations violate the EFTA.

64.     Plaintiff Vasquez's bank account was debited on a recurring basis by Trans World, and Plaintiffs Rovinelli's and Carlos' accounts were debited on a recurring basis by Synapse without Defendants obtaining signed written authorization, or similar authentication, for preauthorized electronic fund transfers.  As such, Plaintiffs are asserting claims that are typical of the Subclasses.  Moreover, Plaintiffs asserted claims are typical of the claims of the other members of the Subclasses in that all members have been harmed in substantially the same way by Defendants' acts and omissions.

65.     Plaintiffs will fairly and adequately represent and protect the interest of the Subclasses.  Plaintiffs have no interests antagonistic or adverse to other members of the Subclasses.  Plaintiffs have retained counsel who are competent and experienced in class action litigation.

66.     Defendants have acted or refused to act on grounds generally applicable to all members of the Subclasses, thereby making final relief concerning the Subclasses in their totality appropriate.

67.     Plaintiffs and the Subclasses have suffered injury and damages as a result of Defendants' wrongful conduct as alleged herein.  Absent a class action, the Subclasses will continue to suffer injury, thereby allowing these alleged violations of law to proceed without remedy, and allowing Defendants to retain the proceeds of their ill-gotten gains.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Subclasses would create the risk of inconsistent or varying adjudications with respect to individual members of the Subclasses.  Moreover, litigation on an individual basis could be dispositive of the interests of absent members of the Subclasses and substantially impair or impede their ability to protect their interests.

69.     In view of the complexity of the issues presented and the expense that an individual plaintiff would incur if he or she attempted to obtain relief from Defendants, the individual claims of the Subclasses' members are monetarily insufficient to support separate actions.  Because of the size of the individual Subclasses' members' claims, few, if any, members of the Subclasses could afford to seek legal redress for the wrongs complained of in this Complaint.

70.     Plaintiffs do not anticipate any difficulty in managing this action as a class action.  The identities of the Subclasses' members are known by Defendants, and the measure of monetary damages can be calculated from Defendants' records.  This action poses no unusual difficulties that would impede its management by the Court as a class action.

## COUNT I
### (For Violations of the Electronic Funds Transfer Act – On Behalf of Plaintiffs and the Subclasses)

71.     The preceding paragraphs are incorporated by reference as if the same were fully set forth herein.

72.     Pursuant to 15 U.S.C. § 1693e(a), (Section 907(a) of the EFTA), a "preauthorized electronic transfer from a customer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

73.     "Preauthorized electronic fund transfer" is defined as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10), Section 903(10) of the EFTA.

74.     Pursuant to 12 C.F.R. § 205.10(b), Section 205.10(b) of Regulation E, "[p]reauthorized electronic fund transfers from a customer's account may be authorized only by a writing signed, or similarly authenticated, by the customer.  The person that obtains the authorization shall provide a copy to the consumer."

75.     "The authorization process should evidence the consumer's identity and assent to the authorization" and "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." Section 205.10(b), Supp I.of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205.10(b), Comments 5 and 6 (emphasis added).

76.     Defendants have violated the EFTA and Regulation E by and through several acts and omissions, including, without limitation the following: (i) failing to obtain Plaintiffs' and members of the Subclasses authorization for pre-authorized electronic transfers to Defendants; and (ii) failing to provide a copy of such authorization to Plaintiffs and members of the Subclasses.  For example, Defendants repeatedly debited Plaintiffs' and the Subclasses' members' credit cards, debit cards and/or bank accounts on a recurring basis without obtaining a valid written authorization signed, or similarly authenticated, for preauthorized electronic fund transfers from Plaintiffs' and the Subclasses' members' accounts.

77.     Thus, Defendants failed to comply with 15 U.S.C. § 1693e(a) (EFTA) and 12 C.F.R. § 205.10(b) (Regulation E) when they debited Plaintiffs' and Subclasses' members' credit cards, debit cards and/or bank accounts on a recurring basis but failed to provide a copy of a written authorization signed, or similarly authenticated, by Plaintiffs or the Subclasses' members for preauthorized electronic fund transfers.

78.     Based upon Defendants' EFTA and Regulation E violations, Defendants are liable to Plaintiffs and the Subclasses for actual damages, statutory damages pursuant to 15 U.S.C. § 1693m, and reasonable attorneys' fees and costs.

## COUNT II
### (For Violations of CUTPA (Conn. Gen. Stat. §§ 42-110a, *et seq.*) – On behalf of Plaintiff Vasquez and the CUTPA Class)[7]

79.     Plaintiff Vasquez realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

80.     Plaintiff Vasquez and members of the proposed CUTPA Class are consumers within the meaning of the CUTPA, and Defendants' memberships and subscriptions are goods within the meaning of the CUTPA. Defendants, through their conduct, are engaged in trade or commerce within the meaning of the CUTPA, and the "free-to-pay" membership/subscriptions offered by Defendants to Plaintiff Vasquez and Class members constitutes consumer transactions within the meaning of the CUTPA.

81.     Defendants engaged in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CUTPA through the following acts and omissions regarding its "free-to-pay" conversion of memberships/subscriptions: (i) Defendants made false and/or

---

[7]     A copy of this Complaint shall be mailed to the Attorney General, Administrators, Commissioners, or other officers, as required by the laws of Connecticut, upon and at the time of the filing of the Complaint pursuant to Conn. Gen. Stat. § 42-110g(c).

misleading statements of material fact, which statements were likely to deceive the public; (ii) Defendants omitted and concealed material facts from Plaintiff Vasquez and the CUTPA Class; and (iii) Defendants knew, or were reckless in not knowing, that its representations were false and/or misleading.

82.     Defendants knew or should have known that these acts and omissions violated the CUTPA and public policy, and were unfair, unethical, oppressive, unscrupulous and caused substantial injury to consumers, including Plaintiff Vasquez and other members of the CUTPA Class.

83.     Defendants' actions, misrepresentations and omissions were done in willful or knowing violation of the CUTPA.

84.     As a result of Defendants' unfair and deceptive conduct, Plaintiff Vasquez and members of the CUTPA Class have suffered ascertainable losses under Conn. Gen. Stat. § 42-110g(a) in the form money or property.  Those ascertainable losses include the loss of monies taken from Plaintiff Vasquez and the CUTPA Class members' bank accounts or charged to their credit cards or debit cards for the memberships/subscriptions.   Plaintiff and members of the CUTPA Class have also otherwise been damaged by Defendants' unfair and deceptive conduct.

85.     Plaintiff Vasquez and members of the proposed Connecticut Class are entitled to compensatory damages from Defendants for the economic and non-economic damages identified herein, together with equitable and declaratory relief and other appropriate damages, including punitive damages, attorneys' fees, and costs of suit.

## COUNT III
### (Unjust Enrichment – On Behalf of the Subclasses)

86.     Plaintiffs reassert and incorporate herein each and every allegation in the preceding paragraphs of this Complaint (excluding ¶¶ 79-85) as if set forth fully herein.

87.     As a result of Defendants' fraudulent, deceptive and wrongful conduct, Plaintiffs and members of the Subclasses have conferred benefits upon Defendants in the form of payment for Defendants' memberships and subscriptions.  Defendants received and accepted from Plaintiffs, and members of the Subclasses, benefits in the form of unauthorized fees and charges for VIP Backstage Pass memberships and magazine subscriptions, which were not authorized or consented to by Plaintiffs and the Subclasses' members, and have little, if any, value.

88.     Defendants were at all times aware that the benefits conferred upon them by Plaintiffs and members of the Subclasses were the result of Defendants' fraudulent, deceptive and wrongful conduct.  Defendants voluntarily accepted and retained the benefits conferred upon them.

89.     Plaintiffs and the Subclasses' members sustained damages when Defendants assessed unauthorized fees and charges for VIP Backstage Pass and magazine subscriptions.

90.     Allowing Defendants to retain these unjust profits and other benefits would offend traditional notice of justice and fair play.  Under these circumstances, it would be inequitable for Defendants to retain the benefits and allowing them to do so would induce companies to fraudulently conceal, mislead, and/or misrepresent key characteristics and obligations of their products to increase sales and profits.

91.     Plaintiffs on behalf of themselves and all others similarly situated, seek restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

<u>**COUNT IV**</u>
**(Money Had and Received – On behalf of Plaintiffs and the Subclasses)**

92.     Plaintiffs reassert and incorporate herein each and every allegation in the preceding paragraphs of this Complaint (excluding ¶¶ 79-85) as if set forth fully herein.

93.     Defendants received monies from consumers to which they were not legally entitled.

94.     Consumers have a claim for the monies Defendants collected in credit card, debit card and/or bank account charges via the VIP Backstage Pass membership and/or magazine subscriptions.

95.     Equity and good conscience requires that Defendants pay back those monies.

96.     Defendants' practices caused Plaintiffs and the Subclasses' members to suffer injury. They are entitled to reimbursement, restitution, and disgorgement in the amount necessary to restore them to the position they would have been in if Defendants had not improperly collected and retained the abovementioned monies.

## COUNT V
### (Conversion – On behalf of Plaintiffs and the Subclasses)

97.     Plaintiffs reassert and incorporate herein each and every allegation in the preceding paragraphs of this Complaint (excluding ¶¶ 79-85) as if set forth fully herein.

98.     Consumers have a right to retain the money Defendants took from consumers' credit card, debit card and/or bank accounts.

99.     Defendant wrongfully converted the monies obtained from consumers' credit cards, debit cards and/or bank accounts, which consumers provided for a limited purpose – to purchase items in-store at FYE – and used it beyond the scope of what was authorized.

100.     Defendants touted the "free" offers as legitimate and then used the offer as a means to charge consumers' credit cards, debit cards and/or bank accounts without authorization. Defendants converted the monies for their own use. The conversion caused consumers to suffer damages because they lost money due to the unauthorized charges.

101.    Consumers are entitled to damages in an amount sufficient to compensate them for their losses, including the amount Defendants wrongfully converted from the unauthorized charges and interest in an amount to be proven at trial.

102.    Based on Defendants' wrongful conversion of the funds assessed and/or charged to Plaintiffs and the members of the Subclasses for VIP Backstage Pass and/or the magazine subscriptions, Defendants are liable for damages, including all amounts wrongfully converted, and costs permitted by law.

## CLAIMS FOR RELIEF

Wherefore, Plaintiffs and members of the Subclasses respectfully request that the Court:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and designate Plaintiffs as the representatives of the Subclasses;

B.    Award statutory damages of $1,000.00, per member of the Subclasses, pursuant to the Electronic Fund Transfer Act, §916(a)(2)(A);

C.    Award actual damages;

D.    Award costs and reasonable attorneys' fees pursuant to the Electronic Fund Transfer Act, §916(a)(3);

E.    Award prejudgment interest at the legal rate;

F.    Determine the damages sustained by Plaintiff Vasquez and the Connecticut Class as a result of Defendants' violations of Conn. Gen. Stat. §§ 42-110a, *et seq.* and award any actual and punitive damages;

G.    A judgment awarding Plaintiffs and members of the Subclasses restitution of all improper fees assessed and/or charged by Defendants;

H.   Award Plaintiffs and the Subclasses' members their costs and disbursements of this suit, including, without limitation, reasonable attorneys' fees, expenses and costs;

I.   An Order declaring that Defendants are obligated to pay both prejudgment and post-judgment interest on any amounts awarded; and

J.   An Order granting such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: November 14, 2018

By their attorneys,

/s/ Angela M. Edwards, Esq.

_____

Angela M. Edwards, Esquire (BBO# 565111)
Law Office of Angela Edwards
72 Canterbury Circle
East Longmeadow, Massachusetts 01028
Tel:     (413) 525-3820 (office)
         (413) 214-8870 (cell)
Fax:     (413) 525-3820
angelaedwards@charter.net

Lee S. Shalov (to be admitted *pro hac vice*)
Wade C. Wilkinson (to be admitted *pro hac vice*)
McLAUGHLIN & STERN, LLP
260 Madison Ave.
New York, NY 10016
Telephone: (212) 448-1100
lshalov@mclaughlinstern.com
wwilkinson@mclaughlinstern.com